# IN THE COURT OF APPEALS OF IOWA

No. 15-1991
Filed May 3, 2017

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JASON SHIMAR KEYS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Cerro Gordo County, Rustin T. Davenport, Judge.

Defendant appeals his conviction of delivery of methamphetamine in violation of Iowa Code section 124.401(1)(c)(6) (2014) following a jury trial and the district court's order substituting new State's exhibits 1, 7, and 8. **AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.**

Dylan J. Thomas of Dylan J. Thomas, Attorney at Law, Mason City, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., Doyle, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**POTTERFIELD, Presiding Judge.**

Jason Keys appeals his conviction of delivery of methamphetamine, in violation of Iowa Code section 124.401(1)(c)(6) (2014), following a jury trial and the district court's order following the State's motion for bill of exceptions substituting State's exhibits 1, 7, and 8. He argues the court erred in multiple rulings and trial counsel was ineffective. He also argues the court erred in ruling that the State's substitute exhibits 1 and 8 were accurate copies of the originals. We remand for the district court to apply the correct standard in its ruling on the motion for new trial and preserve his ineffective-assistance-of-counsel claims for postconviction relief.

**I. Background Facts and Proceedings**

On December 4, 2014, a confidential informant, Jonathan Hjelle, notified Frank Hodak, Sheriff's Deputy and North Central Iowa Drug Task Force investigator, that he could purchase one gram of methamphetamine from Jason Keys later that day. Hodak then assembled other members of the task force to conduct a controlled buy.

In preparation for the buy, Hodak met Hjelle at a predetermined location, searched him, fitted him with a digital recorder and live audio wire, and provided him with one hundred and thirty dollars in pre-recorded buy money. Hjelle then contacted Keys through text messages to confirm the transaction. Hjelle testified that he walked to the house where Keys was located and met Keys in the back bedroom. He stated that he sat down, handed Keys the money, and after Keys commented on an older, crisp fifty-dollar bill, Keys handed the methamphetamine to him. The members of the task force, including Hodak, surveilled the activities

visually through a window and through the live audio wire. During the transaction, the audio recording revealed that Keys referenced an "old school" fifty-dollar bill, which was part of the buy money.

After the purchase, Keys and Hjelle went outside to meet two individuals in a truck. The individuals were interested in trading a stolen bike for methamphetamine, but no transaction took place. Hodak testified that he recognized Keys's distinctive voice on the live audio wire from prior encounters and he could hear Keys explain to the individuals in the truck that he was wearing a facemask because he had active warrants. Hodak also testified that he visually recognized Keys when he exited the building even though Keys was wearing a half ski mask that partially covered the bottom portion of his face.

Following the purchase, Hjelle returned a small bag of a white, crystal substance to Hodak. Hodak field-tested the substance, which tested positive for methamphetamine. Laboratory testing later confirmed the substance was .81 grams of methamphetamine. An arrest warrant was issued for Keys, and in May 2015, he was arrested for delivery of methamphetamine. During a recorded post-arrest interview, Hodak read Keys his *Miranda* rights, explained the charge was related to a controlled buy on December 4, 2014, and indicated that Keys had "options." Hodak advised Keys that he was interested "in moving up the chain" and buying from "other people." Hodak stated, "We know that you middled the deal," and Keys responded affirmatively. Hodak then stated, "We want to move up the ladder" and would talk to the county attorney to "make the charges go away" if Keys assisted with controlled buys.

On June 2, 2015, the State charged Keys with one count of delivery of methamphetamine, in violation of Iowa Code section 124.401(1)(c)(6), and as an habitual felony offender, as defined under section 902.8 and 902.9(1)(c).  Keys filed a motion to suppress evidence arguing, in part, the post-arrest interview should be excluded from trial under Iowa Rule of Evidence 5.408, as the interview included the officer discussing working with prosecutors to reduce the charges.  On August 7, 2015, a hearing was held on the issue.  In its order, the district court determined Hodak's statement "You make some controlled buys for us and make these charges go away" was a promise of leniency.  The court excluded portions of the post-arrest audio recording following Hodak's statement but allowed the preceding conversation between Hodak and Keys to be played for the jury as State's exhibit 8.

At trial, Officer Hodak and informant Hjelle identified Keys as the individual each saw during the controlled buy.  Officer Hodak also identified Keys's voice as a voice on the tape of the controlled buy.  Keys testified he was not the individual who sold methamphetamine to Hjelle.  He stated he never collected one hundred and thirty dollars from Hjelle nor did he hand anyone a bag of methamphetamine.  He also stated, "I have never been a middle man, acted as a middle man, or admitted to being a middle man.  And it clearly shows that on the [post-arrest interview] tape."  Keys admitted on cross-examination that he had active warrants between late September and December 2014.

During closing arguments, the State argued Keys admitted to being a middle man in the post-arrest interview.  The State also said:

And the fact is it's common sense, common sense. Does it look—
Does he sound like a drug dealer, does he look like a drug dealer,
does the case look like—excuse me. Does the case look like a
drug dealer case; and does it look like the evidence shows that he,
in fact, delivered Methamphetamine?

When discussing the role of the confidential informant and the informant's relationship with the police, the state explained, "This is dangerous work, folks. You're dealing with drug dealers. You're dealing with people that are not, in essence, the most innocent people, I guess, is a way to put it. These people can be dangerous."

The jury returned a verdict finding Keys guilty as charged.

Following the district court's denial of Keys's motion for new trial, Keys appealed. For reasons not disclosed in the record, State's exhibit 1, a longer recording containing witness interviews and the full post-arrest interview of Keys, which was not admitted into evidence; State's exhibit 7, the recording of the drug buy; and exhibit 8, the redacted audio recording of the post-arrest interview after the partial grant of Keys's motion to suppress evidence, did not arrive to the Iowa Supreme Court as part of the record. The originals could not be found. The district court ordered the State to prepare duplicate copies and set a hearing on the matter. On June 28, 2016, a hearing was held on the issue whether the substitute exhibits were appropriate to submit to the supreme court as the corrected record. Keys's trial counsel stated he believed the substitutes were accurate copies of the originals. Keys claimed the substitute copies omitted a statement by the police, "That's why we're willing to work with you," in response to Keys's statement, "I don't do drugs." In its order, the court concluded the substitute copies were accurate representations of the State's exhibits and

directed the clerk to forward substitute exhibits 1, 7, and 8 to the supreme court. Keys appealed the June 28, 2016 district court order. On September 6, 2016, the supreme court consolidated both appeals. The case was then transferred to this court.

## II. Standards of Review.

Evidentiary rulings are generally reviewed for abuse of discretion. *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003). Rulings that apply the promise-of-leniency doctrine are reviewed for errors at law. *See State v. Polk*, 812 N.W.2d 670, 674 (Iowa 2012).

Claims of ineffective assistance of counsel are reviewed de novo. *See, e.g.*, *State v. Liddell*, 672 N.W.2d 805, 809 (Iowa 2003).

"Sufficiency of evidence claims are reviewed for a correction of errors at law." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

"[W]e review a claim that the district court failed to apply the proper standard in ruling on a motion for new trial for errors at law." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).

## III. Discussion

### A. Evidentiary Issues.

*1. Promises of Leniency.* Keys argues the district court erred in admitting those portions of his post-arrest interview which preceded the officer's explicit offer of leniency. Specifically, he argues the district court evaluated the conversation between Keys and Hodak under the promise-of-leniency standard

instead of Iowa Rule of Evidence 5.408.[1]  Under rule 5.408, the entire conversation was inadmissible if it was part of a compromise or negotiation.  To the extent the court was correct in applying the promise-of-leniency standard, Keys argues the officer's "promise of leniency" began when the parties discussed "options" and law enforcement's desire to "move up the chain."

First, we agree with the district court's analysis of the audio tape under the promise-of-leniency doctrine.  Under the promise-of-leniency rule, statements made by the defendant are inadmissible "where the prisoner has been influenced by any threat or promise."  *State v. Howard*, 825 N.W.2d 32, 40 (Iowa 2012).  On the other hand, rule 5.408 "is ordinarily not applicable in a criminal case, *except in a plea-bargain situation*."  *State v. Burt*, 249 N.W.2d 651, 652 (Iowa 1977) (emphasis added).  During the post-arrest interview, Keys was interviewed by an officer and not engaged in plea-bargaining with the district attorney.  Accordingly, rule 5.408 is inapplicable to the post-arrest interview.

Second, the district court did not err in admitting the earlier portions of the post-arrest interview.  The standard to determine whether a promise of leniency was made is "whether the language used amounts to an inducement which is

---

[1] The applicable rule states:

> a. *Prohibited uses.* Evidence of the following is not admissible—on behalf of any party—to prove the validity or amount of a disputed claim:
> (1) Furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim that was disputed on either validity or amount.
> (2) Conduct or a statement made during compromise negotiations about the claim.
> b. *Exceptions.* The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Iowa R. Evid. 5.408.

likely to cause the subject to make a false confession." *Howard*, 825 N.W.2d at 40. Generally, the language must reference *how* the suspect would be helped in order for the court to find the defendant was promised leniency. *See State v. McCoy*, 692 N.W.2d 6, 28 (Iowa 2005) ("The line is crossed if the officer also tells the suspect what advantage is to be gained or is likely from making a confession." (citations omitted)); *State v. Bunker*, No. 13-0600, 2014 WL 957432, at *2 (Iowa Ct. App. Mar. 12, 2014) ("[T]he detective did not cross the line because she omitted any reference to how Bunker would be helped."); *State v. Foy*, No. 10-1549, 2011 WL 2695308, at *3–4 (Iowa Ct. App. July 13, 2011) (declining to find promissory leniency where "the investigators did not explain how they were going to 'help' Foy, or what 'benefit,' they could provide him").

Keys was not offered a specific benefit when the officer suggested "we want to move up the chain." Hodak advised Keys to think about it and stated he did not want an answer that day about the possibility of assisting with controlled buys. In fact, Keys was not offered any benefit until Hodak stated, "You make some controlled buys for us and make the charges go away." In its ruling, the court explained:

> Following his arrest, Keys spoke to law enforcement officers. Initially no promises of leniency were made. Officer Hodak informed Jason Keys what he was being charged with, Keys protested and said, "You guys know I don't sell dope." Hodak then explained, "You have some options. Obviously we want to move up the chain. You could buy some dope from some people." Hodak explained that they wanted to move up the ladder, but he didn't want an answer today. Hodak wanted Keys to think about it.
> At approximately 58 minutes, 55 seconds on the recording, Hodak told Keys that Hodak would contact the county attorney. Hodak then said, "You make some controlled buys for us and make these charges go away."

Thereafter, Keys continued his conversation with the officers regarding how they would proceed, and Keys indicated his willingness to work with the police regarding what they had proposed.

The Court finds that when Mr. Hodak made the statement that, "You make some controlled buys for us and make these charges go away" at 58 minutes, 55 seconds in the recording, this was a promise of leniency.

The court suppressed any statements made by Keys after Hodak made the statement, "You make some controlled buys for us and make these charges go away." We agree with the district court's analysis that the portions of the audio recording before the statement were admissible. Statements discussing the potential of Keys conducting a controlled buy did not rise to a promise of leniency until Keys was informed of the advantage to be gained—making the charges "go away." *See McCoy*, 692 N.W.2d at 28. The district court did not err in applying the promise of leniency standard.

*2. Testimony Related to Fingerprinting.* Keys next argues the court abused its discretion in overruling trial counsel's objection to lack of foundation for testimony of Cameron Manson, a Cerro Gordo County Deputy Sheriff, regarding the ability to fingerprint cellophane bags. He claims the witness was required to establish that he had expertise in fingerprinting and attempting to fingerprint cellophane bags. "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Iowa R. Evid. 5.602. Here, Manson was asked if he "ever had success fingerprinting cellophane bags," to which he responded, "I don't remember having any success. I don't have any recollection of having

success with getting fingerprints off of baggies." Manson was testifying about his personal knowledge of fingerprinting cellophane bags and not giving an expert opinion. The trial court did not abuse its discretion in overruling Keys's objection.

*3. Hodak's Controlled Buy Experience and Audio Interpretation.* Keys next argues the court abused its discretion in overruling trial counsel's objection to Hodak's experience conducting controlled buys. At trial, the State asked Hodak, "[H]ow many controlled buys have you personally been the lead investigator for?" Keys's trial counsel objected based on relevance. The court overruled the objection, and Hodak responded, "Hundreds. I don't have an exact number, but in the hundreds range."

Under Iowa Rule of Evidence 5.602, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." During his testimony, Hodak testified about the general procedure of controlled buys. Hodak's testimony about his controlled buy experience was relevant to his testimony about procedure. *See* Iowa R. Evid. 5.602. The trial court did not abuse its discretion in overruling Keys's objection.

Keys also claims the court abused its discretion in overruling an objection to Hodak's interpretation of the live audio wire and his visual identification of Keys in the courtroom based on his identification testimony during the playing of exhibit 7. At trial, the State played the audio recording of the live wire (exhibit 7) while Hodak testified what he heard on the recording and what he observed during the controlled buy. For example, the State asked, "And at the 4:50 mark,

maybe a few seconds before that, did you hear Mr. Keys go into—or what did you hear?" Hodak responded, "I heard him walk into a door and a door shut." After the State played a portion of the audio recording and asked Hodak, "What do you believe he said," trial counsel objected stating, "[T]his procedure . . . is actually not allowing the jury to hear [the contents of the recording] on their own; but Mr. Hodak is trying to infer what he believes is said, as opposed to allowing the jury just to hear what is said; and I believe that is improper."

Under Iowa Rule of Evidence 5.701, a lay witness may testify in the form of an opinion if it is "rationally based on the witness's perception." Hodak testified that during the controlled buy, he was listening in on the live wire. "[W]here there is proper factual foundation for a lay witness to testify, it is within the discretion of a trial court to allow a witness to express an opinion based on such established foundation facts." *State v. McCarty*, 179 N.W.2d 548, 551 (Iowa 1970); *see also* Iowa R. Evid. 5.701. Accordingly, the trial court did not abuse its discretion in ruling on the objections to interpretation of the voices and the visual identification. Keys raises claims of ineffective assistance of counsel to complain counsel failed to object to Hodak's voice identification testimony and to Hodak's testimony about Keys's outstanding warrants as part of the interpretation of Exhibit 7.

**B. Ineffective Assistance of Counsel.**

Keys argues trial counsel was ineffective for failing to (1) object to evidence of his prior bad acts, (2) impeach State witness Hjelle regarding prior

bad acts, (3) object to the text-message evidence, (4) object to voice identification evidence, and (5) object to prosecutorial misconduct.[2]

To prove his claims of ineffective assistance of counsel, Keys must prove by a preponderance of the evidence that (1) counsel failed to perform an essential duty and (2) he suffered prejudice as a result. *See State v. Morgan*, 877 N.W.2d 133, 136 (Iowa Ct. App. 2016). The claim fails if either prong is not proved. *Id.* When a defendant chooses to raise an ineffective-assistance-of-counsel claim on direct appeal, we may either determine the record is adequate and decide the claim or find the record is inadequate and preserve the claim for postconviction proceedings. *See State v. Neitzel*, 801 N.W.2d 612, 624 (Iowa Ct. App. 2011).

To prove the first prong of this claim, Keys must show counsel's performance fell outside the normal range of competency. *See State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). Starting "with the presumption that the attorney performed his duties in a competent manner," "we measure counsel's performance against the standard of a reasonably competent practitioner." *State*

---

[2] In a recent case, the Iowa Supreme Court cautioned against conflating the terms prosecutorial misconduct, which generally describes "those statements 'where a prosecutor intentionally violates a clear and unambiguous obligation or standard imposed by law, applicable rule or professional conduct' as well as 'those situations where a prosecutor recklessly disregards a duty to comply with an obligation or standard,'" and prosecutorial error, which includes situations "'[w]here the prosecutor exercises poor judgment' and 'where the attorney has made a mistake' based on 'excusable human error, despite the attorney's use of reasonable care.'" *State v. Schlitter*, 881 N.W.2d 380, 394 (Iowa 2016) (citations omitted).

We use the term prosecutorial misconduct throughout, as both Keys and the State did in their appellate briefs. We note that we are to apply the multi-factor test outlined in *State v. Graves*, 668 N.W.2d 860, 877–78 (Iowa 2003), either way. *See Schlitter*, N.W.2d at 394 (stating the multifactor test set out to evaluate the statements in determining if there was misconduct and if that was misconduct was prejudicial "easily translate to an evaluation of prosecutorial error").

*v. Maxwell*, 743 N.W.2d 185, 195 195–96 (Iowa 2008). Although counsel is not required to predict changes in the law, counsel must "exercise reasonable diligence in deciding whether an issue is 'worth raising.'" *State v. Westeen*, 591 N.W.2d 203, 210 (Iowa 1999) (quoting *State v. Schoelerman*, 315 N.W.2d 67, 72 (Iowa 1982)). In accord with these principles, we have held that counsel has no duty to raise an issue that has no merit. *State v. Schaer*, 757 N.W.2d 630, 637 (Iowa 2008); *State v. Bearse*, 748 N.W.2d 211, 215 (Iowa 2008) ("Counsel cannot fail to perform an essential duty by merely failing to make a meritless objection."). Under the second prong, "prejudice is shown when it is 'reasonably probable that the result of the proceeding would have been different.'" *Schaer*, 757 N.W.2d at 638 (quoting *State v. Henderson*, 537 N.W.2d 763, 765 (Iowa 1995)). "If an ineffective-assistance-of-counsel claim is raised on direct appeal from the criminal proceedings, we may decide the record is adequate to decide the claim or may choose to preserve the claim for postconviction proceedings." *Straw*, 709 N.W.2d at 133. When analyzing the prejudicial effect of several allegations of ineffective assistance of counsel, we "look to the *cumulative* effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the Strickland test." *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012) (emphasis added).

Here, Keys raises several ineffective-assistance-of-counsel claims.

***1. Prior Bad Acts.***[3]  Keys first argues trial counsel should have objected under Iowa Rule of Evidence 5.404(b)[4] to an audio recording (exhibit 8) where Keys admitted to "middling" a drug transaction.  He also argues trial counsel should have objected under the same rule to testimony suggesting Keys had active warrants for his arrest.  Under rule 5.404(b), "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

During the beginning of the post-arrest conversation, before the promise of leniency, the officer read Keys his *Miranda* rights, informed him they were discussing his case, and confirmed the charge of delivery of methamphetamine from December 4, 2014.  While discussing the charged offense and the controlled buy, Keys stated, "If y'all got me y'all got me.  But I'm pretty sure y'all know, chances are, if that's the case [he] used me as a middle man."  The officer then referenced the specific controlled buy, which led to the charged crime, "I'll be honest with you, we know that you middled the deal."  Keys responded affirmatively and explained, "[People] call me and I can get it for you, that's it."

Keys also claims trial counsel should have objected to the testimony regarding his active arrest warrants during the charged crime pursuant to rule

---

[3] Keys claims the court erred in allowing evidence related to his "middling" and arrest warrants.  However, no objection was made at the trial level.  Accordingly, these issues are presented in the context of ineffective assistance of counsel.

[4] The rule provides:

> b. *Crimes, wrongs, or other acts.*
>
> (1) *Prohibited use.*  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in in accordance with the character.
>
> (2) *Permitted uses.*  This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Iowa R. Evid. 5.404(b).

5.404(b). At trial, Officer Hodak testified about his observations during the surveillance of the controlled buy, including his interpretation of an audio recording (exhibit 7) documenting the controlled buy. Without objection, Officer Hodak stated that, according to Mr. Keys's statements on the audio recording, "Mr. Keys had a face mask on, and they were referencing the face mask. And I don't know if they [the other individuals at the scene] were freaked out by it or not, he just said he had it on because he had a warrant." Officer Hodak then confirmed that Keys had active warrants at the time of the buy. Another witness was asked without objection whether Keys had warrants outstanding during the months surrounding the controlled buy.

   ***2. Testifying Witness Hjelle.*** Keys next argues that trial counsel was ineffective for failing to cross-examine State's witness Jonathan Hjelle about his alleged counterfeiting charge and his experience with controlled buys unrelated to this case. Before trial, the State moved in limine to prevent Keys from cross-examining informant Hjelle about a previous use of counterfeit money and the informant's previous experience with controlled buys. The court ruled Keys could cross-examine Hjelle's about his controlled buy from Keys but not about his history of controlled buys unrelated to the current charges.[5] Trial counsel stated he did not plan to examine Hjelle about the act of passing counterfeit funds.

---

[5] In his brief, Keys also argues the court erred in granting the State's motion in limine regarding Hjelle's history of working as a confidential informant, prior leniencies, and prior compensation. Because trial counsel did not timely object at trial, error is not preserved regarding the court's ruling. *See State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000) ("Ordinarily, error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial."). We note Keys's failure to preserve error does not prevent him from raising the issue under an ineffective-assistance-of-counsel claim in a postconviction proceeding. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010).

At trial, Hjelle was impeached with prior inconsistent statements made under oath, testimony about a prior felony conviction, and testimony about ulterior motives to implicate the defendant in order to fulfill an agreement with the State by which he had a driving while barred charge dismissed. Because there was no conviction involved with the counterfeiting charge, counsel was left with rule 5.608, which "permits cross-examination of a witness concerning a specific instance of conduct by the witness; it does *not* permit such conduct to be proved by extrinsic evidence." *State v. Greene*, 592 N.W.2d 24, 28 (Iowa 1999). It is unclear from the record why trial counsel made a decision to omit Hjelle's counterfeiting charge during cross-examination.

*3. Text Messages.* Keys also argues trial counsel was ineffective for failing to object to text messages for lack of foundation. He claims without the proper foundation, the text messages do not provide any connection between Keys and Hjelle. To the extent the text message were admissible, Keys claims they are hearsay.

Keys claims he was prejudiced "because the jury was encouraged by the State to consider the text messages as establishing the alleged drug transaction as being between [Keys] and Hjelle." The text messages show a conversation between Hjelle and Keys about how far away Hjelle was from Keys's location. In addition to the text messages, Hjelle testified in detail about the controlled buy. For example, he said, "I was over at [Keys's] house earlier [the day of the buy], found out that somebody was coming to town, and I was going to come back later and buy some meth." Hjelle also testified that he arranged the purchase price and amount before contacting Hodak about the controlled buy. He

described the transaction, "I sat down, hand[ed] Jason the money, he looked at the money . . . and they hand[ed] me the bag." Hjelle was then asked "[W]ho handed you the drugs." To which he replied, "Jason [Keys]." Multiple officers also testified that Keys was the individual involved in the controlled buy. It is unclear from the record whether trial counsel made a strategic decision to not challenge the foundation of the text messages based on the additional evidence.

*4. Voice Identification.* Keys next argues trial counsel was ineffective for failing to object to Hodak's identification of Keys's voice for lack of foundation. He claims because identification was an issue at trial, he suffered prejudice because the jury may have accepted the witness's "identification without giving fair consideration to any evidence the defense presented questioning the identity of the voice on the recording." At trial, the State asked Hodak, "And when you saw him while also listening to the live wire, did you determine that it was Mr. Keys prior to talking with anybody else; or was that later?" Hodak stated, "No. It was during the live wire. He's got a distinctive voice also." Keys did not object to the question.

On the issue of identity, the jury was able to evaluate the defendant's voice on its own by comparing the live wire recording, the police interview recording, and Keys's testimony. Witnesses also visually identified Keys in person, including Deputy Hodak's testimony that he saw the defendant during the controlled buy, and Hjelle's testimony about Keys during the controlled buy. It is unclear from the record whether the other forms of evidence supporting voice identification factored into trial counsel's decision not to object to Hodak's testimony linking the voice on the audiotape to Keys.

**5. Prosecutorial Misconduct.** Keys next claims trial counsel was ineffective for failing to object to prosecutorial misconduct. Specifically, Keys argues the following prosecutor's statements were inappropriate: "You're dealing with drug dealers. You're dealing with people that are not, in essence, the most innocent people, I guess, is a way to put it. These people can be dangerous[,]" and "Does it look—Does he sound like a drug dealer, does he look like a drug dealer, does the case look like—Excuse me. Does the case look like a drug dealer case; and does it look like the evidence shows that he, in fact, delivered methamphetamine?"[6] To succeed on an ineffective-assistance-of-counsel claim based on prosecutorial misconduct, a defendant must establish: (1) proof of misconduct; and (2) "the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *Graves*, 668 N.W.2d at 869. "A defendant's inability to prove either element is fatal." *See id.*

The prosecutor's statements must also be prejudicial to the extent that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Carey*, 709 N.W.2d 547, 559 (Iowa 2006). We consider the following factors: (1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; and (5) the extent to which the defense invited the misconduct." *Graves*, 668 N.W.2d at 877. "To determine if the prejudice standard has been met, we look to the totality of the evidence, the factual

---

[6] Keys also argues statements regarding his role as a middle man amounted to misconduct because they misconstrued the discussion in the post-arrest interview.

findings that would have been affected by counsel's errors, and whether the effect was pervasive, minimal, or isolated." *Nguyen v. State*, 707 N.W.2d 317, 324 (Iowa 2005). "The most significant factor is the strength of the State's evidence." *State v. Krogmann*, 804 N.W.2d 518, 526 (Iowa 2011). It is unclear from the record why trial counsel did not challenge the prosecutor's statements during closing arguments.

The record does not indicate trial counsel's thinking on Keys's ineffective assistance claims, and we are unable to evaluate the cumulative prejudicial effect. Accordingly, we cannot resolve the ineffective-assistance-of-counsel claims on direct appeal. *See Clay*, 824 N.W.2d at 494 (holding ineffective-assistance claims are ordinarily preserved for postconviction relief proceedings especially "where the challenged action of counsel implicate trial tactics or strategy which might be explained in a record fully developed to address those issues"). Because Keys raises multiple issues that require further development of the record, we preserve all of the above claims for postconviction relief. *See id.* at 501.

### C. Sufficiency of the Evidence.[7]

Keys next claims the court erred in denying his motion for judgment of acquittal. He argues there was insufficient evidence for a reasonable jury to find him guilty. Specifically, he claims the State failed to prove identity.

---

[7] Keys also claims the district court erred in denying his motion in arrest for judgment. Keys's motion for arrest in judgment, however, challenged the sufficiency of the evidence at the trial level. "A motion in arrest of judgment may not be used to challenge the sufficiency of the evidence." *See State v. Dallen*, 452 N.W.2d 398, 399 (Iowa 1990). The district court did not err in denying the defendant's motion in arrest of judgment.

"In making determinations on the sufficiency of the evidence, 'we . . . view the evidence in the light most favorable to the state, regardless of whether it is contradicted, and every reasonable inference that may be deduced therefrom must be considered to supplement that evidence.'" *State v. Harris*, 891 N.W.2d 182, 186 (Iowa 2017) (quoting *State v. Jones*, 281 N.W.2d 13, 18 (Iowa 1979)). "We will uphold a trial court's denial of a motion for judgment of acquittal if the record contains substantial evidence supporting the defendant's conviction." *Id.* (citation omitted). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted). Generally, direct eyewitness testimony establishing the elements of the crime are sufficient to generate a jury question. *See State v. Kutcher*, No. 14–0602, 2015 WL 4935583, at *2 (Iowa Ct. App. Aug. 19, 2015) (holding officer's testimony that he saw defendant commit crime is sufficient to uphold verdict). Even in light of credibility challenges to a testifying witness, "[t]he jury is free to believe or disbelieve any testimony as it chooses." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993).

Keys was tried for the charge of delivery of methamphetamine. *See* Iowa Code § 124.401(1)(c)(6). The relevant code section provides it is unlawful to deliver "[f]ive grams or less of methamphetamine." *Id.*

Here, the State presented direct eyewitness evidence of the defendant's identity. While Keys denied he was the one who sold methamphetamine, direct testimony from a confidential informant is sufficient to establish the elements of the crime. *See State v. Arne*, 579 N.W.2d 326, 328 (Iowa 1998) (holding evidence was sufficient to support delivery-of-a-controlled-substance charge

when confidential informant's testimony of drug transaction was contradicted by another testifying witness). The jury heard testimony from Hjelle specifically identifying Keys as the individual who sold him one gram of methamphetamine in exchange for one hundred and thirty dollars in marked buy money. The jury also heard testimony from the officers monitoring the controlled buy, and from Keys himself. The jury was able to hear in the voice from the live wire and compare it to Keys's voice from the police interview and his testimony. It is up to the jury to decide if they believe it is Keys's voice on the live wire. The evidence was sufficient on the issue of identity to support the conviction.

**D. Motion-for-New-Trial Standard.**

Keys claims the district court erroneously applied the sufficiency-of-the-evidence standard as opposed to the weight-of-the-evidence standard in denying his motion for new trial. The State concedes the court applied the wrong standard in its ruling.

When ruling on a motion for new trial, a district court may grant the motion if the verdict is contrary to the weight of the evidence. *Ary*, 877 N.W.2d at 706; *see* Iowa R. Crim. P. 2.24. "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Ary*, 877 N.W.2d at 706 (quoting *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006)).

Here, after reviewing arguments from both parties, the district court stated:

> The motion for new trial challenges whether there was *sufficient evidence* to support the conviction. The Court has sat through the trial in this matter, finds that there was. And viewing the light—the evidence most favorably to the State, finds that there was *sufficient evidence* in this matter to find the Defendant guilty, or that, in other

words, the—a reasonable jury could find guilt on the evidence beyond a reasonable doubt.

(Emphasis added.) We agree with the parties that the district court erroneously applied the sufficiency-of-the-evidence standard. Additionally, "[a]ppellate review of a district court ruling on a motion for new trial asserting the verdict was contrary to the weight of the evidence ordinarily does not extend to 'the underlying question of whether the verdict is against the weight of the evidence.'" *Ary*, 877 N.W.2d at 707 (quoting *State v. Taylor*, 689 N.W.2d 116, 134 (Iowa 2004)). We remand the case to the district court to apply the correct standard in considering the motion.

### E. Substitute Exhibits.

On appeal, State's exhibits 1, 7, 8—audio recordings of the post-arrest interview and buy—were lost when the record was submitted to the supreme court. The district court instructed the State to prepare duplicate copies. After the parties reviewed the copies, the district court held a hearing on whether the substitute copies were accurate. Keys's trial attorney represented at the hearing the substitute exhibits were correct copies of the original exhibits. Keys's appellate attorney, however, argued that after Keys stated, "I don't sell dope," Hodak's alleged response, "That's why we're willing to work with you," was omitted from the substitute copies. The district court reviewed the recordings and held the proposed substitutes are accurate copies. Keys does not complain about exhibit 1 which was not admitted nor exhibit 7, which documented the controlled buy. He does argue that exhibit 8, the redacted exhibit of his post-arrest interview, is inaccurate—an argument that dovetails with his argument

none of his post-trial interview should have been admitted because it all contains promissory lenience. Keys asks this panel to supplement the record on its own to include the alleged statement from Hodak.

After a careful review of the record, we agree with the district court and trial counsel Hodak did not respond to Keys's denial he did not sell drugs by saying, "That's why we are willing to work with you." Assuming the statement was made by Hodak and omitted from the substituted exhibit 8, we are not convinced the statement qualifies as a promise of leniency. We affirm the district court on this issue.

### IV. Conclusion.

The trial court did not err in admitting the early portions of the audio recording of the post-arrest interview. The promise of leniency was triggered only when Hodak offered a benefit to Keys. Nor did the trial court abuse its discretion in overruling Keys's objections to Manson's testimony about his experience with fingerprints on cellophane bags, Hodak's controlled-buy experience, or Hodak's testimony interpreting exhibit 7. Testimony from the confidential informant, officers involved in the controlled buy, and evidence of the audio recordings were sufficient to support Keys's conviction. However, the court applied the wrong standard when ruling on Keys's motion for new trial. Keys's claims of ineffective assistance of counsel are preserved for postconviction relief, as the record is inadequate to resolve the issues on direct appeal and we are unable to evaluate the cumulative prejudicial effect on Keys. Finally, we affirm the district court's ruling to substitute exhibits 1, 7 and 8.

**AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.**